# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
**KOHN, SWIFT & GRAF, P.C.**
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700 – phone

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation -
Transfer

☐ 8   Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
_____

Brief description of cause:
_____

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____          DOCKET NUMBER _____

DATE _____          SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**  **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**  **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**  **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**  **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**  **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**



**CASE MANAGEMENT TRACK DESIGNATION FORM**

John Corsale,                                  :                    CIVIL ACTION

                    v.                         :

                                               :          NO. **18    2194**
Sperian Energy Corporation,                    :

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                              ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                                                                      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court.  (See reverse side of this form for a detailed explanation of special
management cases.)                                                                       (x)

(f) Standard Management – Cases that do not fall into any one of the other tracks.          ( )


| May 24, 2018 | | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 238-1700 | (215)238-1968 | Jshub@kohnswift.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

MAY 24 2018

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _John Corsale  43 E High St., Nazareth, PA 18064_

Address of Defendant: _Sperian Energy Corporation  3010 Briarpark Dr, Ste 200, Houston, TX 77042_

Place of Accident, Incident or Transaction: _43 E High St., Nazareth, PA 18064_

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☐   No☒

Does this case involve multidistrict litigation possibilities?   Yes☒   No☐

*RELATED CASE, IF ANY:*

Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases*:

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases*:

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ✔ All other Diversity Cases
    (Please specify)   _190 Other Contract_

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, _Jonathan Shub_ , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: _May 24, 2018_   _____   _53965_
                         Attorney-at-Law      Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _May 24, 2018_   _____   _53965_
                         Attorney-at-Law      Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JOHN CORSALE, Individually and on
behalf of all others similarly situated,

      Plaintiff,

    v.

SPERIAN ENERGY CORPORATION,

      Defendant.

Civil Action No.

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff John Corsale ("Corsale" or "Plaintiff"), individually and on behalf of all others

similarly situated, alleges as and for his Class Action Complaint against Defendant, Sperian

Energy Corporation ("Sperian" or "Defendant"), upon personal knowledge as to himself and his

own acts, and as to all other matters upon information and belief, based upon, *inter alia,* the

investigation made by his attorneys, as follows:

## NATURE OF THE ACTION

1.    This action seeks to redress Defendant's improper pricing practices that have

caused thousands of Pennsylvania consumers to pay considerably more for their electricity than

they should otherwise have paid.

2.    Traditionally, residential electricity was supplied by regulated utilities such as

Met-Ed.  The rates that utilities could charge were strictly controlled.  In the 1990s, however,

Enron's unprecedented lobbying campaign resulted in the deregulation of state energy markets in

Pennsylvania and elsewhere such that consumers were permitted to choose from a variety of

companies selling residential energy. Seizing on deregulation, electric generation suppliers ("EGSs") such as Sperian have grown rapidly.

3.    Price is the most important consideration for energy consumers. Given that there is no difference at all in the electricity that Sperian supplies as opposed to the consumer's utility, the only reason why a consumer would switch to an EGS such as Sperian would be for the prices offered in a competitive market as opposed to the prices offered by a regulated utility. That is, after all, the entire point of energy deregulation.

4.    Defendant has taken advantage of the deregulation of the retail electricity market in Pennsylvania by luring consumers into switching energy suppliers with false promises that it offers variable rates for electricity that are based on market fluctuations and wholesale electricity prices and conditions. Defendant lures consumers into switching by offering low initial rates for electricity. When the "teaser rate" period expires, however, customers are rolled over into a month-to-month variable rate plan with exorbitant rates.

5.    Sperian represents in its contract that it offers a "variable rate" electricity plan to customers that is tied to wholesale electricity prices and conditions. However, contrary to Sperian's representations and obligations, Sperian consistently and improperly charges an extraordinarily high premium rate for electricity *regardless* of fluctuations in the underlying market price. Indeed, as set forth below, Sperian routinely charges its consumers *over double* the underlying market rate, notwithstanding Sperian's representations that its variable rates are based on "market fluctuations" and wholesale electricity prices.

6.    Specifically, Sperian's rates go up to match spikes in the underlying market price. However, when the market price goes down, Sperian's rate remains at an inflated level several times higher than the market rate.

2

7.     Sperian's business model is simple: after the "teaser" rate expires, it charges exorbitant electric prices that match *increases* in the underlying market price while failing to pass-along *decreases*. This business model is designed to maximize revenue for Sperian. As a result, Pennsylvania consumers are being fleeced out of millions of dollars in exorbitant charges for electricity.

8.     This suit is brought pursuant to the common law of Pennsylvania on behalf of a class of consumers who purchased electricity from Sperian at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment. It seeks, *inter alia*, injunctive relief, actual damages, and refunds.

## PARTIES

9.     Plaintiff, John Corsale is a natural person and citizen of Pennsylvania, residing in Nazareth, Pennsylvania in Northampton County. Plaintiff Corsale was a customer of Sperian from approximately June, 2015 through April, 2018. As a result of Defendant's improper pricing practices and price gouging, he incurred excessive charges for electricity.

10.     Defendant, Sperian is a corporation with its principal office located at 3010 Briarpark Dr. Ste. 200, Houston, TX 77042 with its registered office located at 211 E. 7th St., Ste. 620, Austin, TX 78701.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative plaintiff class are citizens of states different from Defendant.

12.     Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391. Defendant regularly transacts and solicits business in this District, and Plaintiff resides in this District. Further, all of the events that give rise to Plaintiff's claims occurred in this District.

## SUBSTANTIVE ALLEGATIONS

### Energy Deregulation and Resulting Widespread Improper Pricing Practices

13.     In 1996, Pennsylvania deregulated the market for retail energy supply, in a major break with past policy. Prior to deregulation, gas and electricity were supplied and distributed solely by local utility companies. Over the last several years, several states, including Pennsylvania, have begun to change the regulations in the energy industry purportedly to enhance competition between energy providers. The purpose of deregulation is to enhance competition between energy providers in the hopes that electric generation suppliers ("EGSs") such as Defendant would help to lower energy costs.

14.     As part of the deregulation plan, EGSs such as Sperian do not have to seek approval of its rates, nor the method by which it set its rates, with the Pennsylvania Utility Commission ("PUC").

15.     EGSs play a middleman role; they purchase energy directly or indirectly from companies that produce energy and sell that energy to end-user consumers. However, EGSs do not deliver energy to consumers. Rather, the companies that produce energy deliver it to consumers' utilities, which in turn deliver it to the consumer. EGSs merely buy electricity at the wholesale rate and then sell that energy to end-users with a markup. Thus, EGSs are essentially brokers and traders. They neither make nor deliver electricity; they merely buy electricity from a producer and resell it to consumers. EGSs such as Sperian have various options to buy electricity at wholesale for resale to retail customers, including owning electricity production

4

facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing electricity in advance by purchasing futures contracts for the delivery of electricity in the future at a predetermined price. The purpose of deregulation is to allow EGSs to use these and other innovative purchasing strategies to reduce electricity costs.

16.     If a customer switches to an EGS, the customer will have his or her energy "supplied" by the EGS but still "delivered" by their existing utility. The customer's existing utility continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is which company sets the price for the customer's energy supply.

17.     After a customer switches to an EGS, the customer's energy supply charge (as based on a customer's kilowatt hour usage) is calculated using the supply rate charged by the EGS and not the regulated rate charged by the customer's former utility. The supply rate charged is itemized on the customer's bill as the number of kilowatt hours ("kWh" or "kwh") multiplied by the rate. For example, if a customer uses 300 kWh at a rate of 11.0¢ per kWh, the customer will be billed $33.00 (300 times $.11) for his or her energy supply.

18.     Almost all states that have deregulated their energy markets did so in the mid- to late 1990s. This wave of deregulation was frantically pushed by then-corporate behemoth Enron. For example, in December 1996, when energy deregulation was being considered in Connecticut, "the most aggressive proponent" of deregulation, Enron CEO Jeffrey Skilling, said:

> Every day we delay [deregulation], we're costing consumers a lot of money . . . .
> It can be done quickly. The key is to get the legislation done fast.[1]

19.     Operating under this sense of urgency, the states that deregulated suffered serious consumer harm. For example, in 2001, forty-two states had either started the deregulation

---

[1] Christopher Keating, "Eight Years Later . . . 'Deregulation Failed,'" *Hartford Courant*, Jan. 21, 2007.

process or were considering deregulation. Today, the number of full or partially deregulated states has dwindled to only seventeen and the District of Columbia. Even within those states, several have recognized deregulation's potential harm to everyday consumers and thus only allow large-scale consumers to shop for their energy supplier.

20.    Responding to shocking energy prices, many key players that supported deregulation now regret the role that they played. For example, reflecting on Maryland's failed deregulation experience, a Maryland Senator commented, "Deregulation has failed. We are not going to give up on re-regulation till it is done."[2]

21.    A Connecticut leader who participated in that state's foray into energy deregulation was similarly regretful:

> Probably six out of the 187 legislators understood it at the time, because it is so incredibly complex. . . . If somebody says, no, we didn't screw up, then I don't know what world we are living in. We did.[3]

22.    Sperian takes advantage of the deregulation and the lack of regulatory oversight in the energy market by deceptively charging Pennsylvania consumers exorbitant rates for electricity. In theory, energy deregulation allows consumers to shop for the best energy rates. However, Sperian exploits deregulated markets with false promises that it offers variable rates based on wholesale market prices and conditions in order to deceive consumers into purchasing energy from it. In fact, Sperian's rates are substantially higher than rates charged by other EGSs and by local utilities, and they are not reflective of whole market fluctuations nor wholesale market prices and conditions.

---

[2] David Hill, "State Legislators Say Utility Deregulation Has Failed in its Goals," *The Washington Times*, May 4, 2011.

[3] Keating, *supra* note 5.

23.     One of deregulation's main unintended consequences has been the proliferation of EGSs such as Sperian, whose business model is primarily based on improper pricing practices.

24.     As a result, regulators have also begun to call out the improper pricing practices that pervade deregulated energy markets thoroughly.  For example, in 2014, New York's Public Service Commission ("NYPSC") concluded that New York's residential and small-commercial retail energy markets were plagued with "marketing behavior that creates and too often relies on customer confusion." [4]  The NYPSC further noted that "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service . . . ."[5]

25.     The improper pricing practices of EGSs such as Sperian have been devastating to consumers nationwide.  For example, based on data recently provided by the major New York electric and gas utilities, the NYPSC calculated that for the thirty (30) months from December 30, 2013 to June 30, 2016, New York's energy service company ("ESCO") customers paid nearly $820 million more for energy than they would have had they stayed with their local utility.  New York's low-income consumers have also been hit hard.  The utilities reported that low-income ESCO customers paid almost $96 million more than residential utility customers for the same period.

26.     Based on the flood of consumer complaints, negative media reports, and data demonstrating massive overcharges, in December 2016, the NYPSC announced an evidentiary hearing to consider primarily whether ESCOs should be "completely prohibited from serving

---

[4] 2014 NY PSC Op No. 12-M-0476 at 4 (Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets) (Feb. 20, 2014).

[5] *Id*. at 11.

their current products" to New York residential consumers.[6]  They essentially intended to

reassess whether New York's deregulation experiment has failed everyday consumers.

## Sperian Charges Improperly High Electricity Rates

27.    In or around June, 2015, Sperian sent Mr. Corsale a solicitation in the mail to his

home in Nazareth, Pennsylvania, soliciting him to switch from his utility company, Met-Ed, to

Sperian, with promises that Sperian would provide him a competitive rate if he switched.  After

Plaintiff received the letter, he called Sperian to find out more about its energy plan.  On the

telephone call, Sperian reaffirmed its promises of a competitive rate if Plaintiff switched to its

electricity plan.

28.    In or around June, 2015, Plaintiff made the switch to Sperian for electricity.

29.    Plaintiff was initially placed on a fixed "teaser" rate for electricity for the first

three months.

30.    When the fixed rate expired, Plaintiff was automatically rolled into a variable rate

plan.

31.    The "Sperian Energy Corp Pennsylvania Electric Service Area Customer Terms

and Conditions" (attached as Exhibit "A") make an express link between the variable rate

charged by the company and the underlying wholesale market rate set by PJM and charged by

Utilities, stating the variable month-to-month rate for electricity "may change each month in

response to market fluctuations based on several conditions including the wholesale electricity

prices in PJM."

32.    Accordingly, a reasonable consumer would understand that Sperian's variable

rates fluctuate in a manner correlated with the underlying wholesale market rate, and that,

---

[6] 2016 NY PSC Op. No. 12-M-0476 at 4 (Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits) (December 2, 2016).

although prices would go up when wholesale prices rose, they would also go down when wholesale prices decreased, enabling consumers to take advantage of market lows.

33.    Additionally, any reasonable consumer would understand based on these representations that Sperian's variable rate would reflect Sperian's cost for purchasing electricity at wholesale, and that the variable rate would be competitive with the rate offered by the local utility and other EGSs.

34.    Instead, and contrary to reasonable consumer expectation, Sperian used its variable rates as a pure profit center, increasing the rates charged to class members when wholesale prices rose, but staying at a level significantly higher than the wholesale market rates even when the wholesale prices fell.

35.    Plaintiff paid Sperian's variable rate from approximately September, 2015 until approximately April, 2018.  During that time, Mr. Corsale received electricity service at his residence in Nazareth, Pennsylvania and he received his billing statements in the mail, which were sent to his residence in Nazareth, Pennsylvania.  Ultimately, the overcharging became so excessive, that, in approximately April, 2018, Plaintiff cancelled his service with Sperian and returned to West Penn Power for electricity.

36.    The following table identifies the billing periods during the time Plaintiff paid Sperian's variable rate, the variable rates that Sperian charged Plaintiff, and the corresponding rates that Met-Ed would have charged for electricity (which is a reasonable representation of the available market rates):

| Billing Period[7] | Sperian Rate | Utility Rate[8] | Difference[9] |
|---|---|---|---|
| Service End Date | $/kWh | $/kWh | % |
| 10/15/2015 | 0.095900 | 0.07250 | 32% |
| 2/16/2016 | 0.099900 | 0.08310 | 20% |
| 3/16/2016 | 0.092900 | 0.07620 | 22% |
| 4/13/2016 | 0.079900 | 0.07070 | 13% |
| 5/13/2016 | 0.079900 | 0.07070 | 13% |
| 6/13/2016 | 0.079900 | 0.06600 | 21% |
| 7/14/2016 | 0.079903 | 0.05950 | 34% |
| 8/12/2016 | 0.082900 | 0.05950 | 39% |
| 9/14/2016 | 0.082900 | 0.06350 | 31% |
| 10/12/2016 | 0.082900 | 0.06900 | 20% |
| 11/14/2016 | 0.082900 | 0.06900 | 20% |
| 2/14/2017 | 0.099900 | 0.07350 | 36% |
| 3/15/2017 | 0.099900 | 0.07150 | 40% |
| 4/13/2017 | 0.089900 | 0.06960 | 29% |
| 5/16/2017 | 0.085900 | 0.06960 | 23% |
| 6/17/2017 | 0.089900 | 0.06510 | 38% |
| 7/17/2017 | 0.089900 | 0.06020 | 49% |
| 8/15/2017 | 0.094900 | 0.06020 | 58% |
| 9/15/2017 | 0.097960 | 0.06010 | 63% |
| 10/16/2017 | 0.099900 | 0.05990 | 67% |
| 11/15/2017 | 0.099900 | 0.06000 | 67% |
| 12/14/2017 | 0.114900 | 0.06390 | 80% |
| 1/16/2018 | 0.114900 | 0.06820 | 68% |
| 2/14/2018 | 0.119900 | 0.06820 | 76% |
| 3/15/2018 | 0.131200 | 0.06490 | 102% |
| 4/13/2018 | 0.121990 | 0.06180 | 97% |

37.     In the electricity market, the rates that Pennsylvania utilities such as Met-Ed

charge are an accurate reflection of rates that are based on market fluctuations and wholesale

[7] The first day of the period is approximately thirty days before. Plaintiff's bills for periods ending November 2015, December 2015, January 2016 are unavailable.

[8] This is the Met-Ed Price to Compare, which is found on Plaintiff's billing invoices.

[9] Sperian's total bill includes a fixed monthly "Energy Service Fee" of $4.93. For an accurate comparison, this fee is not calculated into the overcharging percentage. Thus, Sperian cannot be heard to argue its Energy Service Fee justifies its excessive rates because even excluding the fixed fee from the total bill, the overcharging was still excessive.

electricity prices and conditions.  In fact, Met-Ed purchases electricity for its customers via a competitive procurement process from the same wholesale electricity market from which other electricity retailers, including Sperian, can purchase electricity for its customers.

38.    For utility customers in Pennsylvania who do not get their electricity supply from an EGS, the utilities buy electricity from the Pennsylvania wholesale electricity markets.  The Federal Energy Regulatory Commission (FERC) regulates the wholesale electricity market, which is administered by the PJM Interconnection.  Utilities (and EGSs) purchase electricity at the wholesale level for resale to their customers.  Thus, the purchases made by the utilities from the wholesale market reflect actual market costs and conditions.

39.    That Sperian's rate was substantially higher than the local utility's rate therefore demonstrates that Sperian's rate is not in fact based on wholesale market prices and conditions. At multiple points, Sperian charged Plaintiff a rate that was substantially higher than the rate charged by Met-Ed.  Indeed, as evidenced by the above chart, there were multiple months where Plaintiff's electricity rate with Sperian was *over 65% higher* than the rate charged by Met-Ed during that same billing period.

40.    Met-Ed and Sperian are purchasing electricity from the same wholesale market. They may be purchasing electricity over different durations (daily, monthly, yearly), which may explain why the prices are not precisely the same, but over time, they should be commensurate.

41.    The truth is that Sperian does not price its electricity based on based on wholesale market fluctuations and wholesale electricity prices and conditions as stated in its contract.  The following table is a pre-discovery calculation of the variable rates that Sperian charged Plaintiff, and the applicable wholesale market price from the PJM market (which is a proper measure of wholesale prices, as specified in Sperian's customer contract):

| Billing Period[10] | Sperian Rate | Wholesale Market Price[11] | Difference[12] |
|---|---|---|---|
| Service End Date | $/kWh | $/kWh | % |
| 10/15/2015 | 0.095900 | 0.05114 | 88% |
| 2/16/2016 | 0.099900 | 0.05403 | 85% |
| 3/16/2016 | 0.092900 | 0.04584 | 103% |
| 4/13/2016 | 0.079900 | 0.04075 | 96% |
| 5/13/2016 | 0.079900 | 0.04524 | 77% |
| 6/13/2016 | 0.079900 | 0.04291 | 86% |
| 7/14/2016 | 0.079903 | 0.04670 | 71% |
| 8/12/2016 | 0.082900 | 0.06096 | 36% |
| 9/14/2016 | 0.082900 | 0.05629 | 47% |
| 10/12/2016 | 0.082900 | 0.04768 | 74% |
| 11/14/2016 | 0.082900 | 0.04161 | 99% |
| 2/14/2017 | 0.099900 | 0.06094 | 64% |
| 3/15/2017 | 0.099900 | 0.05017 | 99% |
| 4/13/2017 | 0.089900 | 0.06247 | 44% |
| 5/16/2017 | 0.085900 | 0.06006 | 43% |
| 6/17/2017 | 0.089900 | 0.05722 | 57% |
| 7/17/2017 | 0.089900 | 0.05169 | 74% |
| 8/15/2017 | 0.094900 | 0.05834 | 63% |

---

[10] The first day of the period is approximately thirty days before. Plaintiff's bills for periods ending November 2015, December 2015, January 2016 are unavailable.

[11] The Wholesale Market Price is comprised of weighted locational marginal pricing (LMP), which includes Generation charges, electrical losses, capacity, transmission, and small ancillary services (as specified in the contract). The Wholesale Market Price also includes Pennsylvania Gross Receipts Tax, which is found on Plaintiff's billing invoices.

[12] As in the previous chart, Sperian's total bill includes a fixed monthly "Energy Service Fee" of $4.93. For an accurate comparison, this fee is not calculated into the overcharging percentage. Thus, Sperian cannot be heard to argue its Energy Service Fee justifies its excessive rates because even excluding the fixed fee from the total bill, the overcharging was still excessive.

12

| | | | |
|---|---|---|---|
| 9/15/2017 | 0.097960 | 0.05020 | 95% |
| 10/16/2017 | 0.099900 | 0.05513 | 81% |
| 11/15/2017 | 0.099900 | 0.04898 | 104% |
| 12/14/2017 | 0.114900 | 0.05390 | 113% |
| 1/16/2018 | 0.114900 | 0.07558 | 52% |
| 2/14/2018 | 0.119900 | 0.15527 | -23% |
| 3/15/2018 | 0.131200 | 0.05217 | 151% |
| 4/13/2018 | 0.121990 | 0.05263 | 132% |

42.    Thus, Sperian's statements with respect to the electric rates that it means to charge are materially misleading because customers do not receive a rate that reflects the wholesale market pricing of electricity.  Instead, consumers are charged rates that are substantially higher. Sperian fails to disclose this material fact to its customers.

43.    The cost of wholesale electricity is the primary component of costs that Sperian incurs.  The other factors that Sperian identifies in its contract that affect its variable rate (i.e., "Pennsylvania Gross Receipts Tax") are insignificant in terms of the overall costs that Sperian incurs to provide retail electricity, and do not fluctuate much over time.  Therefore, these other cost factors cannot explain the drastic increases in Sperian's variable rate, nor the reason why its rates are so disconnected from changes and fluctuations in wholesale costs.

44.    That Sperian's variable rate does not reflect market costs for wholesale electricity is also demonstrated by the disconnect between fluctuations in wholesale electricity prices and costs and Sperian's rates.  As the wholesale market price fluctuates, Sperian's variable rate does not correspond to those fluctuations.  Instead, Sperian's variable rate remains *significantly higher* than the corresponding market price.  As evidenced by the above chart, there were multiple

months where Plaintiff's electricity rate with Sperian was over ***100-150% higher*** than the market price during that same billing period.

45.    As set forth above, Sperian breaches its contract as its consumers do not receive a price based on market fluctuations and wholesale electricity prices and conditions. Instead, consumers are charged rates that are substantially higher than those of competitors and untethered from wholesale market prices and conditions. Sperian intentionally fails to disclose this material fact to its customers because no reasonable consumer —including Mr. Corsale — who knows the truth about Sperian's exorbitant rates would choose Sperian as an electricity supplier.

46.    A reasonable consumer would understand that the price the local utility or other EGSs charges is affected by wholesale market prices and conditions, and that a price based on wholesale market prices and conditions would be consistent with the price charged by the local utility or other EGSs. However, Sperian's prices are substantially and consistently higher than local utilities' rates, as well as the rates that other EGSs charge.

47.    Defendant Sperian's statements regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price. No reasonable consumer who knows the truth about Sperian's exorbitant rates would choose Sperian as an electricity supplier.

48.    In fact, all that Sperian offers customers is electricity delivered by local utilities, commodities that have the exact same qualities as electricity supplied by other EGSs or local utilities. There is nothing to differentiate Sperian from other EGSs or local utilities, and the potential for a price based on wholesale market prices and conditions is the only reason any reasonable consumer would enter into a contract for electricity with Sperian.

14

49.    Sperian knows full well that its rates are unconscionably high.  As such, Sperian's actions were at worst actuated by malice and at best accompanied by wanton and willful disregard for consumers' well-being.

50.    Sperian's conduct caused injury to Plaintiff because his contract stated that his rate would be based on based on market fluctuations and wholesale electricity prices and conditions when in fact his rates were not.

51.    Had Sperian charged Plaintiff a rate that was actually based on based on market fluctuations and wholesale electricity prices and conditions, Plaintiff would have been charged a substantially lower rate.  He was injured accordingly when he paid his bills.

## CLASS ALLEGATIONS

52.    Plaintiff brings this action pursuant to Pennsylvania law on behalf of himself and all other similarly situated Sperian customers in the Commonwealth of Pennsylvania who were charged a variable rate for electricity at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment.

53.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or complaint.

54.    Excluded from the Class are Defendant; any parent, subsidiary or affiliate of Defendant; any entity in which any Defendant has or has had a controlling interest or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor or assignee of a Defendant.

55.    This action is properly maintainable as a class action.  As provided in Pennsylvania law, the proposed Class is so numerous that joinder of all members, whether

15

otherwise required or permitted, is impracticable. There are questions of law or fact common to all Class Members that predominate over any questions affecting only individual members. Specifically, the common questions of fact and law include:

      i.    Whether Defendant breached Sperian's contract with Pennsylvania consumers by charging variable rates not based on wholesale market prices and conditions;

     ii.    Whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof; and

   iii.    Whether Defendant should be enjoined from continuing to charge variable rates not based on wholesale market prices and conditions.

56.    The proposed lead Plaintiff's claims are typical of the proposed class because the proposed lead Plaintiff's claims are based upon the same facts and circumstances (practice or course of conduct) that gives rise to the claims of the other class members, and based upon the same predominant legal theories.

57.    The representative Plaintiff can adequately and fairly represent the class. No conflict of interest exists between the representative Plaintiff and the Class Members because Defendant's alleged conduct affected them similarly.

58.    The Plaintiff and his chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution. In addition, the Plaintiff's attorneys are competent in the areas of law relevant to this Complaint and have sufficient experience and resources to vigorously represent the Class Members and prosecute this action.

59.     A class action is superior to any other available method for adjudicating this controversy.  The proposed class is the surest way to (i) fairly and expeditiously compensate so large a number of injured persons that constitute the Class, (ii) keep the courts from being inundated by hundreds if not thousands of repetitive cases, and (iii) reduce transaction costs so that the injured class members can obtain the most compensation possible.  Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation relevant to this action.

## CLAIMS FOR RELIEF

### COUNT I
**(Breach of Contract)**

60.     Plaintiff incorporates by reference the preceding allegations as if fully set forth herein, and further alleges:

61.     Plaintiff and the Class entered into a valid contract with Sperian for the provision of electricity.

62.     Pursuant to the Agreement, it is upon information and belief Sperian agreed to charge a variable rate for electricity based on wholesale market prices and conditions.

63.     Pursuant to the Agreement, Plaintiff and the Class paid the variable rates charged by Sperian for electricity.

64.     However, Sperian failed to perform its obligations under the Agreement because Sperian charged variable rates for electricity that were not based on wholesale market prices and conditions.

65.     Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was substantially higher than they would have been had Sperian based its rates on wholesale market prices and conditions.

66.     By reason of the foregoing, Sperian is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial.

**COUNT II**
**(Unjust Enrichment)**
**(In the Alternative to Count I)**

67.     Plaintiff incorporates by reference the preceding allegations as if fully set forth herein, and further alleges:

68.     If the Court finds no contract existed between Plaintiff and Defendant, Plaintiff brings this claim for unjust enrichment.

69.     By engaging in the conduct described above, Sperian has unjustly enriched itself and received a benefit beyond what was contemplated in the contract, at the expense of Plaintiff and the other members of the Class.

70.     It would be unjust and inequitable for Defendant to retain the payments that Plaintiff and the Class made for excessive electricity charges.

71.     By reason of the foregoing, Sperian is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of which shall be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(a) Issue an order certifying the Class defined above, appointing the Plaintiff as Class Representative and designating his attorneys as Class Counsel;

(b) Find that Sperian has committed the violations of law alleged herein;

(c) Enter an order granting monetary relief and damages on behalf of the Class;

(d) Determine that Defendant has been unjustly enriched as a result of its wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Class;

(e) Determine that Defendant breached the contract with the Class and enter an appropriate order awarding monetary and injunctive relief;

(f) Enter an order granting all appropriate relief on behalf of the Class under the applicable state laws;

(g) Render an award of compensatory damages, the amount of which is to be determined at trial;

(h) Enter a judgment including interest, costs, reasonable attorneys' fees, costs and expenses; and

(i) Grant all such other relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Date: May 24, 2018                                    Respectfully submitted,

Jonathan Shub
Kevin Laukaitis
**KOHN, SWIFT & GRAF, P.C.**
1600 Market Street
Suite 2500
Philadelphia, PA 19103
Phone: 215-238-1700
jshub@kohnswift.com
klaukaitis@kohnswift.com

19

Charles E. Schaffer
Daniel C. Levin
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: 215-592-1500
CSchaffer@lfsblaw.com
DLevin@lfsblaw.com

D. Aaron Rihn
**ROBERT PEIRCE & ASSOCIATES, P.C.**
2500 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219-1918
Phone: (412) 281-7229
arihn@peircelaw.com

***Attorneys for Plaintiff and the Class***

# EXHIBIT A



June 30, 2015

John Corale
43 E High St
Nazareth PA 18064

Dear John Corale,

Thank you for choosing Sperian Energy as your electricity supplier. We value you as a customer, and will continue to provide you with reliable service at a great low rate of ...

**Account#: 08048174080002035693**
**$0.0735 per kWh / 3 Month Term - Fixed Rate**
**Termination Fee: $49**
**Energy Service Fee: $4.93**

As a Sperian Energy customer, the only difference you will see on your electric bill is in the supplier portion on the bill. In this section, you will see Sperian Energy's name, and of course your new low electric generation rate. The local distribution company ("LDC") will handle the delivery of your electricity and continue to send you a bill every month, just like it always has. You will make payments to the LDC and, like always, if there is ever a problem or emergency, call the LDC so they may assist you with any power delivery issues.

Your rate will include the generation, transmission charge, and gross receipts tax but does not include a monthly Energy Service Fee of $4.93, distribution charges, or state and local tax.

Sperian Energy wants to remind you to pay your bill in a timely fashion or you may lose your discounted electric generation rate. Please be sure to pay your bill on time to save on your low electric generation rate every month.

As a new Sperian Energy customer, you can visit our website to find documents that will inform you of our customer service pledge, describe the delivery of your electric service, plus the terms and conditions of our electric generation service.

Sperian Energy is committed to providing superior service to every customer, large or small. We want to make it as easy as possible for you to solve any problems or get answers to any questions you may have.

To help achieve this, we have included a list of Sperian Energy contact numbers and addresses you may use to contact a service representative in the event that you're LDC can't assist with your urgent needs. You can contact us using the following:

**Electric Generation Supplier Name:**
Sperian Energy Corp
**Phone:**
888.682.8082
**Fax:**
800.256.6181
**Email:**
info@sperianenergy.com
**Website:**
www.sperianenergy.com
**Mailing Address:**
2605 Camino Del Rio South, San Diego, CA 92108
**Hours of Operation:**
9:00AM – 6:00 PM E.S.T / Monday – Friday
**Electric Distribution Company of Last Resort:**
MetEd
**Phone:**
800-545-7741

 We offer Green rate plans for residential and commercial customers!

*** Our 100% Green rate consists of 50% Wind and 50% *Pumped-Storage* Hydroelectricity (PSH)***

Thank you for choosing Sperian Energy. We look forward to providing you with your electric generation service for many years to come.

Sincerely,

Sperian Energy Corp
State Licensing #: PA License #A-2011-2250633



PAPUC License No. A-2011-2250633

# Sperian Energy Corp
## Pennsylvania Electric Service Area
## Customer Terms and Conditions

The following is your Terms of Service ("Agreement") with Sperian Energy Corp ("Sperian Energy") for the purchase of electricity service. Sperian Energy agrees to sell and Customer agrees to buy the quantity of electricity delivered to you, as measured or estimated by your Electric Distribution Company ("EDC"). Sperian Energy is an Electric Generation Supplier ("EGS") and will supply electricity as specified in the Contract Summary and Welcome Letter as described under this Agreement. The words "we," "us," and "our" refer to Sperian Energy, and the words "you" and "your" refer to the Customer. Retain this Agreement, the Welcome Letter and the Contract Summary for your records. These components are considered to be an integral part of this Agreement.

Sperian Energy is licensed as an EGS with the Public Utilities Commission (PUC) in the Commonwealth of Pennsylvania. Sperian Energy's license number is A-2011-2250633. Generation prices and charges are set by Sperian Energy and the Public Utility Commission (PUC) regulates electric distribution prices and services. The Federal Energy Regulatory Commission regulates electric transmission prices and services.

## DEFINITIONS

**Generation Charge-** Charge for the production of electricity.

**Transmission Charge-** Charge for moving high voltage electricity from a generation facility to the distribution lines of an EDC.

**Distribution Charge-** Charge for delivering electricity over a distribution system to the home or business from the transmission system

Your EDC has programs available to customers who are on a limited income to assist them with utility bills.

For Universal Service Programs, such as CAP Rate, Customer Assistance & Referral Evaluation Services (CARES), Matching Energy Assistance Fund (MEAF) call (800) 774-7040. For Low Income Home Energy Assistance Program (LIHEAP), call (800) 344-3574. For Low Income Usage Reduction Program (LIURP), call (800) 675-0222.

## Terms of Service

**Eligibility:** Sperian Energy does not deny residential electric service or determine eligibility for pricing based on credit history, utility payment data or credit score. Sperian Energy does not deny service based on a customer or applicant's race, creed, color, national origin, ancestry, sex, marital status, lawful source of income, level of income, disability, familial status, location of a customer/applicant in an economically distressed geographic area, or qualification for low income or energy efficiency services.

**Length of Agreement:** Your service under this Agreement is provided for a term specified in the Contract Summary and the Welcome Letter. Should you cancel your service before the end of a fixed term plan, you will be subject to an early termination fee. If you are a new Customer, your selected product will become effective on the day your service begins with Sperian Energy, which coincides with the date your meter is read by the EDC. Because this date is determined by your EDC, Sperian Energy is not able to commit to a specific date for the commencement of service. If you are currently a Sperian Energy Customer and are switching to another product, your selected product will become effective within 24 hours of the request to switch to the new product.

**Contract Renewal/Change in Terms:** This agreement does not renew automatically. At the end of the initial term, if you do not choose a new product, your term products will rollover into a month-to-month variable product. Sperian reserves the option to modify any term product in the event of a Material Adverse Change. A Material Adverse Change is defined as a market or regulatory event beyond Sperian's control, which would cause a material negative effect on Sperian being able to perform its obligations under this Agreement. In the case of a Material Adverse Change event, Sperian will comply with all applicable rules for notice in advance of any change. **If you do not agree with the proposed revised terms due to the Material Adverse Change, you may cancel your term Agreement without penalty.** You will receive two written notices from us either as a bill message or in separate email or direct mail that precedes either the expiration date of your Agreement or the effective date of any proposed changes in Terms. We will explain your options to you in these two advanced notifications.



PAPUC License No. A-2011-2250633

If you have a variable product agreement with us, Sperian Energy may amend the terms of this Agreement at any time, consistent with any applicable law, rule or regulation, by providing notice to Customer of such amendment at least thirty (30) days prior to the effective date thereof. Sperian Energy will supply Customer with a current version of this document annually and upon request.

**Pricing & Payment:** Each payment period, you will receive a single bill from your EDC that includes Sperian Energy generation supply charges as well as the EDC's delivery charges. Your term and price will be disclosed to you at the time of enrollment in the Contract Summary and the Welcome Letter. The price for our Month to Month variable product will be calculated monthly and may change each month in response to market fluctuations based on several conditions including the wholesale electricity prices in PJM. Sperian Energy's price may be higher or lower than the EDC;s rate in any given month. There is no cap to this variable rate and the rate you pay will be listed on the billing invoice you receive monthly from your EDC. The variable product includes the price for electric generation, transmission, related services and will include the Pennsylvania Gross Receipts Tax. It does not include distribution charges, any applicable state or local sales taxes (if any) or (if applicable) Sperian's monthly Energy Service Fee of $4.93.

Your payment will be due to the EDC by the date specified in the EDC bill. Except as otherwise provided in this agreement or by law, all taxes of any kind, nature and description, due and payable with respect to Customer's performance of its obligations under this Agreement, shall be paid by Customer. The parties' obligations under this Agreement are subject to present and future legislation, orders, rules, or regulations of a duly constituted governmental authority having jurisdiction over this Agreement or the services to be provided herein.

**Conditions under which Savings to the Customer are Guaranteed:** No savings are guaranteed.

**Sperian Energy Promotions:** All promotions associated with Sperian Energy enrollment rate plans are subject to the terms and conditions listed on the customer's Welcome Letter and Contract Summary.

**Access to Customer Information:** Customer acknowledges that customer billing and payment information will be provided to Sperian Energy from your EDC. This information includes, but is not limited to, Customer's account number, meter reading data, rate class and electric usage, Customer's address(es) and telephone number, and Customer's budget billing product or payment arrangement preference. Customer further understands that the EDC is required by the PUC to communicate with Customer following a notice of change of EGS to confirm the change was authorized.

**Dispute Resolution:** In the event of a billing dispute or a disagreement involving any essential element of this Agreement, the parties will use their best efforts to resolve the dispute. Customer should contact the EDC regarding any billing dispute, and should contact Sperian Energy in writing at 2605 Camino Del Rio S., San Diego, CA 92108 or by telephone at (888)682-8082 or by email at info@sperianenergy.com for any terms of service dispute. If after discussing your problem with Sperian Energy or the EDC you remain dissatisfied, you may file an informal complaint with the Public Utility Commission by telephoning the Utility Choice Hotline at (800) 692-7380 or by writing to the following address: Public Utility Commission, PO Box 3265, Harrisburg, Pennsylvania 17120.

**Consumer Protections:** The services provided by Sperian Energy are protected by the terms and conditions of this Agreement and the Pennsylvania Public Utilities Commission (PUC). The complete text of the PUC Customer Protection Rules referenced herein can be found in the Pennsylvania Code, Title 52, Public Utilities at: http://www.pacode.com/secure/data/052/chapter54/subchapAtoc.html and http://www.pacode.com/secure/data/052/chapter56/chap56toc.html.

**Right to Rescind:** You may rescind this Agreement without fee or penalty of any kind within three (3) business days of receiving the Welcome Kit. You can contact Sperian Energy at (888) 682-8082. You may rescind in writing, orally, or electronically, if available. Please provide your name, address, phone number and a statement that you are rescinding your Agreement under the three (3) day Right of Rescission.

**Cancellation:** To cancel this Agreement under a month-to-month product, you may call or fax Sperian Energy at the contact information provided above. Under a term product, you agree to remain a Customer of Sperian Energy until the term expires. In the case you choose to leave Sperian's service while under a term contract, you will be charged the early termination fee set forth in your Contract Summary and Welcome Letter.

If you cancel services, you agree to pay for the services provided by Sperian Energy through the date you are switched to another EGS or returned to the EDC for service and for any collection fees incurred by Sperian for non-payment of amounts due. You are responsible for all charges incurred through the date on which cancellation is effected by the EDC. Sperian Energy reserves the right to cancel this agreement (i) if your


**SPERIAN** ENERGY

PAPUC License No. A-2011-2250633

EDC is unable to read your meter for three (3) consecutive months; (ii) if at any time you request separate bills from your EDC and Sperian Energy Services; or (iii) changes in laws, rules or regulations have the effect of increasing Sperian Energy's costs of supplying electricity to you or (iv) if the EDC removes you from their consolidated billing program and requires that Sperian Energy bill you separately for your electricity supply. We will notify both you and your EDC of the cancellation of this agreement at least 14 days prior to the effective date of cancellation.

**Governing Law:** This Agreement shall be governed by and construed, enforced and performed in accordance with the laws of the State of Pennsylvania and venue shall be in Allegheny County, Pennsylvania. The provisions of the Uniform Commercial Code (UCC) shall apply to this Agreement, and electricity shall be a "good" for purposes of the UCC.

**Assignment:** You may not assign this Agreement, in whole or in part, or any of its rights or obligations hereunder without the prior written consent of Sperian Energy. Sperian Energy may, without your consent, (a) transfer, sell, pledge, encumber or assign this Agreement or the accounts, revenues or proceeds hereof (b) transfer or assign this Agreement to an affiliate of Sperian Energy; (c) transfer or assign this Agreement to any person or entity succeeding to all or substantially all of the assets of Sperian Energy; and/or (d) transfer or assign this Agreement to a PUC-certified EGS. In the case of (b), (c) or (d), any such assignee shall agree in writing to be bound by the terms and conditions hereof. Upon any such assignment, Customer agrees that Sperian Energy shall have no further obligations hereunder.

**LIMITATIONS OF LIABILITY:** LIABILITIES NOT EXCUSED BY REASON OF FORCE MAJEURE OR OTHERWISE SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES. EXCEPT AS SPECIFICALLY OTHERWISE SET FORTH HEREIN, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY OR INDIRECT DAMAGES. LOST PROFITS OR PENALTIES OF ANY NATURE ARE HEREBY WAIVED. THESE LIMITATIONS APPLY WITHOUT REGARD TO THE CAUSE OF ANY LIABILITY OR DAMAGE, INCLUDING THE NEGLIGENCE OF SPERIAN ENERGY. THERE ARE NO THIRD-PARTY BENEFICIARIES TO THIS AGREEMENT.

**Severability:** If any provision of this Agreement is held by a court or regulatory agency of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall continue in full force without being invalidated in any way.

**No Warranties:** Unless otherwise expressly set forth in this Agreement, Sperian Energy provides and Customer receives no warranties, express or implied, statutory, or otherwise and Sperian Energy specifically disclaims any warranty of merchantability or fitness for a particular purpose. Delay or Failure to Exercise Rights: No partial performance, delay or failure on the part of Sperian in exercising any rights under this Agreement and no partial or single exercise thereof shall constitute a waiver of such rights or of any other rights hereunder.

**Title:** Title and risk of loss to the electricity sold hereunder shall pass from Sperian Energy to you (Customer) when it is delivered to the Point of Delivery under this Agreement. Point of Delivery is a point or points on the PJM Interconnection Grid identified by your EDC for such deliveries. Delivery to your meter(s) will be made by your EDC. You shall indemnify and defend Sperian Energy from all claims for any loss, damage, or injury to persons or property arising from or related to the distribution or consumption of electricity at and after the Point of Delivery.

**Waiver:** No partial performance, delay or failure on the part of Sperian Energy in exercising any rights under this Agreement and no partial or single exercise thereof shall constitute a waiver of such rights or of any other rights hereunder.

**Force Majeure:** The term "Force Majeure" shall mean any cause not reasonably within the control of the Party claiming suspension and which by the exercise of due diligence, such Party is unable to prevent or overcome, including but not limited to, any act or cause which is deemed a Force Majeure by the EDC or any transportation or transmitting entity. If either party is unable, wholly or in part, by Force Majeure to perform or comply with any obligations or conditions of this Agreement, such party shall give immediate written notice, to the maximum extent practicable, to the other party. Such obligations or conditions, so far as they are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, and such party shall be relieved of liability and shall suffer no prejudice for failure to perform the same during the period. The party claiming suspension of obligations must in good faith attempt to mitigate and/or terminate the Force Majeure.



PAPUC License No. A-2011-2250633

**Entire Agreement:** This Agreement together with the Contract Summary and the Welcome Letter sets forth the entire agreement between the parties with respect to the terms and conditions of this transaction; any and all other agreements, understandings and representations by and between the parties with respect to the matters addressed herein are superseded by this Agreement, the Contract Summary and the Welcome Letter.

**Acceptance:** This Agreement shall not become effective until accepted by Sperian Energy.

**Contact Information:**

For questions concerning your rate, service initiation, or service cancellation, please contact Sperian Energy using the contact information below:

**Sperian Energy**
2605 Camino Del Rio S.
San Diego, CA 92108
Customer Service (888)682-8082
Facsimile (800)256-6181
Email: info@sperianenergy.com
Operating Hours: M – F 9:00 a.m. – 6:00 p.m. EST
www.sperianenergy.com

In the event of a power outage or emergency, please contact your local EDC using the contact information below:

**Public Utility Commission of Pennsylvania (PUC)**
PO Box 3265
Harrisburg, PA 17105-3265
Utility Choice Hotline: (800) 692-7380

**Electric Distribution Company & POLR:**

**PECO:** (800) 841-4141
2301 Market Street, P.O. Box 8699,
Philadelphia, PA 19101

**PPL:** (800) 342-5775
Two North Allen Street
Allentown, PA 18101

**Duquesne Light:** (888) 393-7000
411 Seventh Avenue (6-1)
Pittsburgh, PA 15219

**MetEd:** (800)545-7741
2800 Pottsville Pike
Reading, PA 19612

**Penelec:** (800)545-7741
1091 Broad Street
Johnstown, PA 15906